# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

-------------------------------------------------------x

In re

APHTON CORP.,

      Debtor.

Chapter 11

Case No. 06-10510 (CSS)

-------------------------------------------------------x

WAYNE WALKER, as Trustee of
Aphton Corp.,

      Plaintiff,

   -v.-

SONAFI PASTEUR, a/k/a AVENTIS, SF
CAPITAL PARTNERS LTD., HEARTLAND
GROUP, INC., solely on behalf of the
HEARTLAND VALUE FUND, and LEGG
MASON PARTNERS FUNDAMENTAL
VALUE FUND, INC., f/k/a SMITH
BARNEY FUNDAMENTAL VALUE
FUND, INC.,

      Defendants.

Adv. Pro. No. 08-50636

-------------------------------------------------------x

## MEMORANDUM OF LAW OF FORMER NOTEHOLDERS IN SUPPORT OF THEIR MOTION TO DISMISS

| | |
|---|---|
| PEPPER HAMILTON LLP | WILLKIE FARR & GALLAGHER LLP |
| David B. Stratton | Alan J. Lipkin |
| Leigh-Anne M. Raport | Paul W. Horan |
| Hercules Plaza, Suite 5100 | 787 Seventh Avenue |
| 1313 Market Street | New York, New York 10019-6099 |
| P.O. Box 1709 | Tel: (212) 728-8000 |
| Wilmington, DE 19899-1709 | Fax: (212) 728-8111 |
| Tel: (302) 777-6500 | |
| Fax: (302) 421-8390 | |

                Co-attorneys for Former Noteholder Defendants

Defendants Legg Mason Partners Fundamental Value Fund, a series of Legg Mason Partners Equity Trust and successor to Legg Mason Partners Fundamental Value Fund, Inc., SF Capital Partners Ltd., and the Heartland Group, Inc., solely on behalf of the Heartland Value Fund (collectively, the "Former Noteholders"), through their undersigned counsel, respectfully submit this memorandum of law in support of their motion to dismiss the claims asserted against the Former Noteholders in the complaint (as amended, the "Complaint") of Wayne Walker, as trustee (the "Trustee") of Aphton Corp. ("Aphton"), in the above-captioned proceeding[1].

**PRELIMINARY STATEMENT**

The Trustee seeks to avoid and recover payments made by Aphton to the Former Noteholders in November 2005. The payments were made to retire approximately $20 million in principal amount of debt held by the Former Noteholders, who in exchange collectively received a total of $3 million in cash and shares of Aphton stock that would prove to be worthless. As the payments were made outside the 90-day limitations period applicable to preferential transfers, the payments were not subject to a preference claim.

Realizing this avenue was foreclosed, the Trustee nevertheless filed the Complaint, repackaging his time-barred preference action as a fraudulent transfer claim. Yet, as described by one leading treatise, "If there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential transfer does not constitute a fraudulent conveyance." 1 Garrard Glenn, Fraudulent Conveyances and Preferences § 289, at 488 (rev. ed. 1940). Thus, while payments made to satisfy antecedent debt might or might not be voidable

---

[1] Although the Complaint characterizes Mr. Walker as the "Trustee," no basis is provided for that title.

preferences, they are not fraudulent transfers. Indeed, as a matter of law a time-barred preference action may not be maintained as a fraudulent transfer action. Accordingly, because Aphton made the payments at issue to satisfy an antecedent debt, the fraudulent transfer claims in the Complaint cannot be maintained and the Complaint should be dismissed as against the Former Noteholders.

Another reason the Trustee's claims against the Former Noteholders must fail is that Aphton's payments were "settlement payments" made by and to "financial institutions" under section 546(e) of the Bankruptcy Code. The payments fall within the extremely broad definition of "settlement payment" utilized by the Third Circuit and were made by and to financial institutions. Hence, the payments are exempt from recovery as fraudulent transfers. Consequently, for these and other reasons, the Complaint should be dismissed as against the Former Noteholders.

## SUMMARY OF ALLEGED FACTS

The Complaint's factual allegations concerning the Former Noteholders are few and vague. The Complaint alleges that in or around March 2003, the Former Noteholders paid Aphton $15 million in exchange for notes (the "Notes") bearing an equivalent face value.[2] (Complaint ¶ 26-27.) According to the Complaint, upon the occurrence of an event of default, the Former Noteholders were entitled to redeem the Notes for cash equal to 110% of the principal amount of the Notes being redeemed (plus accrued and unpaid interest as well as any other amounts due under the Notes). (Complaint ¶ 29.) The Complaint further alleges the Former Noteholders, at an unspecified time, asserted that Aphton's payment of certain funds to Sonafi Pasteur a/k/a Aventis constituted an event of default. (Complaint ¶ 30.) According to the

---

[2]   In fact, the Former Noteholders eventually paid $20 million for $20 million in principal amount of Notes.

Complaint, the Former Noteholders and Aphton entered into an agreement, dated November 23, 2005 (the "Exchange Agreement"), pursuant to which the Former Noteholders surrendered the Notes in exchange for, collectively, a total of $3 million in cash and 10,000 shares of Aphton preferred stock and 2 million shares of Aphton common stock (the "Exchange Agreement Payments"). (Complaint ¶ 31.)

Based on these assertions, the Complaint includes three counts against the Former Noteholders. Counts V and VI seek to avoid the Exchange Agreement Payments as fraudulent transfers under sections 544 and 548, respectively, of the Bankruptcy Code. Count VII seeks to recover the Exchange Agreement Payments from the Former Noteholders pursuant to section 550 of the Bankruptcy Code.

Not included in the Complaint, but admitted in the Debtors' First Amended Disclosure Statement, dated February 22, 2007 (the "Disclosure Statement"), are the following additional facts of note regarding this proceeding. Specifically, the Debtor described a series of substantive, but ultimately unsuccessful, prepetition endeavors by the Debtor, made possible by the November 2005 consummation of the Exchange Agreement, to obtain new investors. Those endeavors, which reflected the value of the Debtor's enterprise and, therefore, the value of the Notes exchanged by the Former Noteholders, included, inter alia, the following:

- "As a result of [inter alia] the consummation of the $20 million debt exchange [with the Former Noteholders], the Debtor no longer had any long-term debt on its balance sheet. Accordingly, the Debtor retained "Oppenheimer to pursue strategic alternatives for the Debtor." Id. § 2.4.11.

- "In addition to a number of other strategic partner candidates, in November 2005, Oppenheimer introduced the Debtor to Spectrum Pharmaceuticals, Inc. ("Spectrum"). After lengthy negotiations and an extensive due diligence review, Spectrum expressed significant interest in pursuing a strategic opportunity with the Debtor." Id. § 2.4.12.

- "On February 16, 2006, the Debtor engaged Life Science Group ("LSG") as the Debtor's exclusive financial advisor to seek strategic alternatives." Id. § 2.4.15.

- "Despite preparing a term sheet in which it proposed to offer $14 million in stock to acquire all of the outstanding equity interests, and assume all of the liabilities, of the Debtor, on March 9, 2006, Spectrum informed the Debtor that it again was not prepared to move forward with the acquisition at that time." Id. § 2.4.17.

- "After entering into [an April 2006] letter of intent [with the Debtor], NGN [Capital "NGN"] continued to conduct its due diligence review of the Debtor and on or about May 4, 2006, engaged outside counsel to prepare definitive documents for the transaction. In addition, the Chief Executive Officer of the Debtor and representatives of LSG met with numerous investors to build a syndicate of investors for financing. As a result of these efforts, a syndicate of investors agreed to commit $16 million to the financing." Id. § 2.4.19.

Notwithstanding these efforts, the Debtor filed its chapter 11 petition on May 23, 2006.

**ARGUMENT**

Federal Rule of Civil Procedure 12(b)(6) is made applicable to this adversary proceeding pursuant to Bankruptcy Rule 7012. In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. Eaton v. Danberg, 545 F. Supp. 2d 396, 398 (D. Del. 2008) (citations omitted). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the… claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks and citation omitted). Though a complaint need not include detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement' to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1965 (citations omitted). The factual allegations must be enough to raise a right to relief "above the speculative level." Id.

A plaintiff is required to make a "showing" rather than a blanket assertion of an entitlement to relief. Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement

that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." Id. (citing Twombly, 127 S. Ct at 1965 n.3). Thus, "'stating… a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." Id. at 235 (quoting Twombly, 127 S. Ct. at 1965 n.3). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Id. at 234.

I. **The Complaint Fails To State A Claim Because The Alleged Transfers Were Made To Satisfy Antecedent Debt.**

In seeking to set aside and recover the Exchange Agreement Payments, the Trustee asserts the payments were fraudulent transfers. Yet even if the Trustee had pled particularized facts concerning the alleged fraud as required by the applicable pleading standard—which, as demonstrated below, he has not—the Trustee's claims still would fail as a matter of law because the Exchange Agreement Payments were made to satisfy antecedent debt and, therefore, were made for reasonably equivalent value. Indeed, the Trustee's claims against the Former Noteholders are nothing more than time-barred preference claims dressed up as fraudulent transfer claims and, therefore, are not actionable and should be dismissed.

A. **The Trustee's Section 548(a) And 544 Claims Fail Because The Satisfaction Of The Former Noteholders' Debt Provided "Reasonably Equivalent Value" For The Exchange Agreement Payments.**

Count VI of the Complaint seeks to avoid the Exchange Act Payments as a constructively fraudulent transfer pursuant to section 548(a). A transfer may be avoided pursuant to section 548(a) only if that transfer was made when the debtor was insolvent (or otherwise met the financial distress test) and the debtor received "less than reasonably equivalent

value in exchange."[3] 11 U.S.C. § 548(a)(1)(B). The Bankruptcy Code further provides that "'value' means property, or satisfaction or securing of a present or antecedent debt of the debtor, . . . . " 11 U.S.C. § 548(d)(2)(A) (emphasis added).

Based on this unambiguous statutory language, numerous courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent. See, e.g., Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director or major shareholder of the transfer"); In re APF Co., 308 B.R. 183, 188 (Bankr. D. Del. 2004) (Trustee could not state § 548 constructive fraud claim because "the payments made on the promissory note were made for value, satisfaction of antecedent debt"); In re Trace Int'l Holdings, Inc., 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("Past consideration is good consideration. An 'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent value, and putting aside transfers to insiders, the payment of an existing liability is not fraudulent."); In re B.Z. Corp., 34 B.R. 546, 548 (Bankr. E.D. Pa. 1983) ("The loan payments made [by the debtor] are not avoidable since under § 548(d)(2)(A) the payments were made for value, i.e., 'the satisfaction of . . . [an] antecedent debt of the debtor.'"). Correspondingly, courts hold that de facto satisfaction of an antecedent debt by collateralizing that debt also may not be avoided as a fraudulent transfer. See, e.g., In re AppliedTheory Corp., 330 B.R. 362, 363 (S.D.N.Y. 2005) ("*per se* rule" that "debtor's grant of a security interest in its assets to a lender who has previously given the debtor a cash loan may not be considered a fraudulent conveyance"); In re M. Silverman Laces, Inc., No. 01 Civ. 6209, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (collateralization of an antecedent debt conferred

---

[3] The Former Noteholders reserve all rights on whether Aphton was insolvent at the time of the Exchange Agreement and on all other issues.

"reasonably equivalent value as a matter of law"); In re Kaplan Breslaw Ash, LLC, 264 B.R. 309, 328-29 (S.D.N.Y. 2001) (citing multiple cases for same proposition).

Here, the Complaint itself alleges the Exchange Agreement Payments were made in satisfaction of Aphton's antecedent debt as reflected by the Notes. See Complaint ¶ 31. Notably, because it includes no allegations concerning the value of the transfers at issue, the Complaint does not and could not allege facts showing satisfaction of the Notes was not "reasonably equivalent value" received by Aphton in exchange for its transfer to the Former Noteholders of $3 million in cash plus stock in a company the Trustee alleges then was insolvent. See Complaint ¶ 63.

While the Trustee theoretically could have argued that the $3 million of cash plus the value of the Aphton stock that Aphton delivered to the Former Noteholders somehow far exceeded the face amount due under the Notes in November 2005 (including the 10% addition to principal because the Notes were in default plus accrued and unpaid interest), he fails to allege any facts in the Complaint that would support that conclusion.[4] Moreover, that approach would be irreconcilable with the Complaint, which alleges Aphton was insolvent and apparently presumes the Notes were worthless in November 2005, so that any consideration provided to Aphton to retire the Notes was in exchange for no value.[5] Yet, if the Notes had no or minimal value, then certainly Aphton's common and preferred stock, which were junior in priority to the Notes at a time Aphton allegedly was insolvent, also must have been worthless or had minimal

---

[4] As discussed below, in Section III infra, the Trustee's failure to allege the value of what the Former Noteholders received from Aphton is a violation of Fed. R. Civ. P. 9(b).

[5] In fact, the Notes had value as reflected, inter alia, by the $3 million in cash Aphton had available to satisfy the Notes, the funds utilized by Aphton to operate and to retain advisors from November 2005 until Aphton filed its chapter 11 petition on May 23, 2006, and the distributions made available to unsecured creditors under Aphton's plan. See Disclosure Statement §§ 2.4.11, 2.4.15.

value. Consequently, the Trustee has no basis to contend Aphton did not receive reasonably equivalent value under section 548.

Not only did Aphton's satisfaction of antecedent debt represented by the Notes constitute reasonably equivalent value as a matter of law, but Aphton also received reasonably equivalent value in the form of the opportunity to address its financial problems outside of bankruptcy. In effect, in November 2005, either Aphton already was in default under the Notes, so that payment on the Notes could have been demanded immediately or by their terms payment on the Notes could have been demanded as soon as March 31, 2006. See Complaint ¶¶ 29-30. Thus, as conceded by Aphton, consummation of the Exchange Agreement benefited Aphton because it "no longer had any long term debt on its balance sheet" and, therefore, could "pursue strategic alternatives." Disclosure Statement § 2.4.11. Hence, the Exchange Agreement transfers provided Aphton with reasonably equivalent value both by satisfying the Notes and by giving Aphton "breathing room."[6]

Consequently, Count VI of the Complaint, which seeks to avoid Aphton's transfers to the Former Noteholders as constructively fraudulent under section 548 does not state a cause of action.

---

[6] See In re AppliedTheory Corp., 330 B.R. at 364 ("the lender's decision not to demand payment, but rather to extend the loans, gave the debtor 'an opportunity to avoid default, to facilitate rehabilitation, and to avoid bankruptcy.' While this 'breathing room' may have proved to be short-lived . . . , that does not affect the conclusion that it was of reasonably equivalent value at the time it was given.") (citations omitted); Anand v. Nat'l Republic Bank of Chicago, 239 B.R. 511, 517-18 (N.D. Ill. 1999) (holding that debtor received reasonably equivalent value when bank agreed to forbear on pursuing remedies for default, waived past-due principal payment, and extended maturity date of notes in return for debtor's assignment of interest in real property as collateral to secure loans); see also Steven L. Schwarcz, Rethinking Freedom of Contract: A Bankruptcy Paradigm, 77 Tex. L. Rev. 515, 592-93 (1999) ("The rule [that payment of antecedent debt may not be a fraudulent transfer] may promote bankruptcy policy by allowing a troubled debtor the flexibility to secure or pay it debts in order to avoid default or reach an out-of-court settlement, thereby facilitating its rehabilitation.").

Count V of the Complaint, which seeks to avoid the same transfers to the Former Noteholders pursuant to section 544, fares no better. The section 544 Count alleges the Trustee may avoid Aphton's transfers under the Pennsylvania and Delaware versions of the Uniform Fraudulent Transfer Act (the "UFTA"). Yet, the Pennsylvania and Delaware versions of the UFTA contain identical provisions, similar to section 548, making clear that satisfaction of antecedent debt constitutes "reasonably equivalent value." See 12 Pa. C.S.A. § 5103(a) ("Value is given for a transfer . . . if, in exchange for the transfer or obligation, . . . an antecedent debt is secured or satisfied . . . "); 6 Del. C. §1303(a) (same). Accordingly, the Exchange Agreement transfers also were not constructively fraudulent under Pennsylvania or Delaware law and, therefore, the Trustee has no basis to rely on Section 544.

  **B.**  **The Trustee's Section 550 Claim Fails Because The Exchange Agreement Payments Cannot Be Avoided Under Sections 548 Or 544.**

Section 550 provides that "to the extent that a transfer is avoided under section 544 . . . [or] 548 . . . of this title, the trustee may recover . . . the property transferred . . . from the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). As explained above, however, the Exchange Agreement transfers cannot be avoided under section 544 or 548. Thus, section 550 is inapplicable here.

Moreover, under section 550(b)(1), the Trustee may not recover from "a transferee that takes for value, including satisfaction . . . of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). As a matter of law, the challenged transfers provided Aphton with "value" through the delivery of the Notes to satisfy Aphton's antecedent debt. Also, the Trustee does not (and could not) make allegations in the Complaint that the Former Noteholders acted in bad faith or had

knowledge of the purported voidability of the transfers. Consequently, section 550(b)(1) also precludes the Trustee from recovering here.

    **C.    The Distinction Between Preferences And Fraudulent Transfers Mandates Dismissal Of The Complaint.**

The conclusion Aphton's transfers to the Former Noteholders were for reasonably equivalent value as a matter of law also is dictated by the distinction between preferences and fraudulent transfers. In effect, the Complaint's three Counts against the Former Noteholders are a transparent attempt to pursue time-barred preference claims against the Former Noteholders by mislabeling the Complaint's Counts as fraudulent transfer claims. Yet, many courts have stated that the distinction between a preference and a fraudulent transfer is a meaningful one so that a time-barred preference action may <u>not</u> be pled as a fraudulent transfer action. <u>See, e.g.</u>, <u>Boston Trading Group, Inc. v. Burnazos</u>, 835 F.2d 1504, 1509, 1511 (1st Cir. 1987) (a preference "is <u>not</u> a fraudulent conveyance." "The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy <u>some</u> of his creditors; it normally does not try to choose among them."); <u>In re AppliedTheory Corp.</u>, 330 B.R. at 363 n.2 (affirming dismissal of fraudulent transfer claim where "facts are evocative of a voidable preference," but the preference claim was time-barred); <u>In re Sharp Int'l Corp.</u>, 302 B.R. 760, 780 (E.D.N.Y. 2003) ("the fundamental principle [is] that a preference – a payment by an insolvent debtor satisfying debts to one creditor at the expense of others – is not a fraudulent conveyance"); <u>In re Trace Int'l Holdings, Inc.</u>, 301 B.R. at 805-06 ("If there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential transfer does not constitute a fraudulent conveyance.") (<u>quoting</u> 1 Garrard Glenn, <u>Fraudulent Conveyances and Preferences</u> § 289, at 488 (rev. ed. 1940)); <u>In re Kaplan</u>, 264 B.R. at 330 (dismissing fraudulent transfer action where "[i]t

may be that the Debtor has confused a fraudulent conveyance with a preference").[7]

Consequently, the Trustee has failed to plead a viable fraudulent transfer claim.

## II. The Complaint Fails To State A Claim Because The Transfers To The Former Noteholders Were "Settlement Payments" Under Section 546(e).

Even if Aphton did not receive "reasonably equivalent value" for the Exchange Agreement transfers (a possibility the Former Noteholders adamantly reject), the Complaint fails to state a claim because pursuant to section 546(e) of the Bankruptcy Code, the delivery of $3 million of cash and the Aphton stock to the Former Noteholders was a "settlement payment." Specifically, section 546(e) provides in pertinent part that "the trustee may not avoid a transfer that is . . . a settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution . . . ." 11 U.S.C. § 546(e). The terms utilized in section 546(e) are defined as follows:

- A " 'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).

- A "financial institution" includes "a Federal reserve bank, or an entity that is a commercial or savings bank . . . or in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940." 11 U.S.C. § 101 (22).

- A "securities contract" includes "a contract for the purchase, sale or loan of a security . . . . " 11 U.S.C. § 741(7)(A)(i).

---

[7] Commentators agree that a preference may not be a fraudulent transfer. See Weintraub & Resnick, Bankruptcy Law Manual, ¶ 7.06[8] at 7-61 ("[A]n insolvent debtor receives value by paying an old obligation. For this reason, making a preference in good faith is not a fraudulent conveyance because value is exchanged by the cancellation of the antecedent debt."); 5 Collier on Bankruptcy (15th ed.), ¶ 547.02, at 547-11 ("In dividing [fraudulent transfers from preferences], the drafters of the Code intended to prevent any overlapping of the provisions relating to such matters, a policy continued from prior law."); Schwarcz, Rethinking Freedom of Contract: A Bankruptcy Paradigm, 77 Tex. L. Rev. at 592-93 ("History and policy" explain why a debtor's securing or payment of antecedent is deemed to be in exchange for reasonably equivalent value. "Historically, fraudulent conveyance law was intended to prevent fraud, and securing or paying a legitimate debt is not fraudulent. The rule may promote bankruptcy policy by allowing a troubled debtor the flexibility to secure or pay it debts in order to avoid default or reach an out-of-court settlement, thereby facilitating its rehabilitation.") (footnotes omitted).

- A " 'security' includes (i) [a] note; . . . ." 11 U.S.C. § 101 (49)(A)(i).

Courts commence their interpretation of section 546(e) and the related definitional sections "by looking to the plain language of the statute." In re Resorts Int'l Inc., 181 F.3d 505, 515 (3d Cir. 1999). On that basis, application of section 546(e) here requires the presence of two elements, a "settlement payment" made to or by a "financial institution."

As to the settlement payment requirement, under section 546(e), the transfer of Aphton stock and cash in exchange for the Notes was a settlement payment as that term is commonly used in the securities trade. See In re Resorts Int'l, 181 F.3d at 515-16 (payment for shares was a settlement payment for purposes of § 546(e)); Bevill, Bresler & Shulman Asset Management Corp. v. Spencer Savings & Loan Assoc., 878 F.2d 742, 751, 752 (3d Cir. 1989) ("[T]he transfer of record ownership of securities is an integral element in the securities settlement process." "[A] 'settlement payment' may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, . . . ."); Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 850 (10th Cir. 1990) ("The transfer of money and preferred stock was the settlement of that [securities] transaction."); 5 Collier on Bankruptcy (15th ed.) ¶ 546.06 [2][b] 546-50-51 ("A 'settlement payment' includes any transfer of securities toward the completion of a securities transaction, including routine securities transactions and more complicated transactions such as the transfer of consideration in a leveraged buyout transaction.") (footnotes omitted). Indeed, as the Third Circuit has stated, the "statutory definition of 'settlement payment'" is "extremely broad." In re Resorts Int'l Inc., 181 F.3d at

515 (citation omitted). Thus, the Former Noteholders received "settlement payments" as a matter of law.[8]

As to the financial institution requirement of section 546(e), under the Exchange Agreement the $3 million in cash transferred to the Former Noteholders was paid "by wire transfer." Exchange Agreement § 1(a)(ii)(A). Thus, the cash transfer was "by" a "financial institution." See In re Plassein Int'l Corp., 366 B.R. 318, 323 (Bankr. D. Del. 2007), aff'd 388 B.R. 46 (D. Del. May 15, 2008) ("The [financial institution] requirement is satisfied when a leveraged buyout payment is made by wire transfer.") (citing In re Resorts Int'l, 181 F.3d at 515). "Indeed, federal regulations require that a wire transfer *must* be performed by a bank; . . ." Id., 366 B.R. at 323 (citing In re Loranger Mfg. Corp., 324 B.R. 575 (Bankr. W.D. Pa. 2005)).

Also, the transfer of both the Aphton stock and the $3 million of cash to the Former Noteholders was "to" a "financial institution" because at least two of the Former Noteholders are investment companies under the Investment Company Act of 1940. Further, that transfer was in connection with a securities contract because the Exchange Agreement was a contract for the purchase and sale of securities, i.e. the Notes. See Exchange Agreement §1(a); § 6 ("CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL"); § 7 ("CONDITIONS TO EACH INVESTOR'S OBLIGATION TO PURCHASE"). Moreover, section 546(e) covers transfers of both publicly traded and privately held securities. See In re Plassein Int'l Corp., 366 B.R. at 325.

Hence, the transfers at issue here unquestionably were "settlement payments" by and to "financial institutions." Consequently, section 546(e) precludes the Trustee from avoiding

---

[8] Notably, "courts that have interpreted the meaning of settlement payment . . . treat the question as one of statutory construction" so that the section 546(e) defense is a "question of law." In re Comark, 971 F.2d 322, 324-25 (9th Cir. 1992) (citations omitted).

Aphton's transfer of Aphton stock and cash to the Former Noteholders under either section 544 or section 548(a)(1)(B).

**III.    The Complaint Is Not Pled With Sufficient Particularity To Satisfy Rule 9(b).**

Even if the Complaint was based on an actionable legal theory, the Complaint would be subject to dismissal because its allegations do not satisfy the pleading requirements of Fed. R. Civ. P. 9(b), which apply to fraudulent transfer claims asserted in bankruptcy cases under Bankruptcy Rule 7009.  See In re Oakwood Homes Corp., 325 B.R. 696, 698 (Bankr. D. Del. 2005) ("There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud.") (citations omitted).  Even the relaxed Rule 9(b) requirements that apply to such claims asserted by a bankruptcy trustee require more than mere identification of the allegedly fraudulent transfers.  Id. at 699 (dismissing fraudulent transfer claims where plaintiff "alleged no facts or other supporting information which would establish the fraudulent nature of [the] alleged transfers and has essentially recited only the statutory language of § 548(a) of the Code"); In re Global Link Telecom Corp., 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing fraudulent transfer claim where complaint failed to allege, among other things, "the value of what was received" in the transfer).

Here, the Complaint fails to plead with any particularity a number of facts essential to demonstrating constructive fraud.  Most glaringly, the Complaint fails to allege the value of what the Former Noteholders received from Aphton or the reasons why Aphton failed to receive "reasonably equivalent value" when the Former Noteholders surrendered their Notes.  Additionally, Count V of the Complaint, which purports to state a claim under section 544, is deficiently pled because it does not identify the elements of a claim under state law—or, for that matter, even refer to the purportedly applicable statutory provisions—and accordingly pleads no

facts showing the Trustee is entitled to relief under those statutes.  See Global Link, 327 B.R. at 718 (dismissing § 544 claim where complaint failed to identify "the applicable state law, the legal standard, or any relevant facts").  Accordingly, the Complaint should be dismissed as against the Former Noteholders for the additional reason that the Complaint fails to satisfy the pleading standards of Rule 9(b).

**[Remainder of Page Intentionally Left Blank]**

# CONCLUSION

For the foregoing reasons, the Former Noteholders respectfully request that the Court enter an order dismissing the Complaint as against the Former Noteholders with prejudice and granting such other relief as the Court deems appropriate.

Dated: July 30, 2008  
Wilmington, Delaware

Respectfully submitted,

PEPPER HAMILTON LLP


 /s/ Leigh-Anne M. Raport  
David B. Stratton (DE No. 960)  
Leigh-Anne M. Raport (DE No. 5055)  
Hercules Plaza, Suite 5100  
1313 Market Street  
P.O. Box 1709  
Wilmington, DE 19899-1709  
Tel: (302) 777-6500  
Fax: (302) 421-8390

-and-

WILLKIE FARR & GALLAGHER LLP  
Alan J. Lipkin  
Paul W. Horan  
787 Seventh Avenue  
New York, New York  10019-6099  
Tel: (212) 728-8000  
Fax: (212) 728-8111

*Co-attorneys for Defendants Legg Mason Partners Fundamental Value Fund, a series of Legg Mason Partners Equity Trust and successor to Legg Mason Partners Fundamental Value Fund, Inc., SF Capital Partners Ltd., and the Heartland Group, Inc., solely on behalf of the Heartland Value Fund*