UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------x

In re                                    Chapter 11

APHTON CORP.,                            Case No. 06-10510 (CSS)

               Debtor.

------------------------------------------------------x

WAYNE WALKER, as Trustee of              Adv. Pro. No. 08-50636
Aphton Corp.,

               Plaintiff,

      -v.-

SONAFI PASTEUR, a/k/a AVENTIS, SF
CAPITAL PARTNERS LTD., HEARTLAND
GROUP, INC., solely on behalf of the
HEARTLAND VALUE FUND, and LEGG
MASON PARTNERS FUNDAMENTAL
VALUE FUND, INC., f/k/a SMITH
BARNEY FUNDAMENTAL VALUE
FUND, INC.,

               Defendants.

------------------------------------------------------x

**MEMORANDUM OF LAW OF FORMER NOTEHOLDERS IN SUPPORT OF THEIR MOTION PURSUANT TO RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AS MADE APPLICABLE BY BANKRUPTCY RULE 9023 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, OR IN THE ALTERNATIVE, RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AS MADE APPLICABLE BY BANKRUPTCY RULE 9024, FOR RECONSIDERATION OF ORDER DENYING THE FORMER NOTEHOLDERS' MOTION TO DISMISS COUNTS VI AND VII OF THE COMPLAINT**

Defendants Legg Mason Partners Fundamental Value Fund, a series of Legg Mason Partners Equity Trust and successor to Legg Mason Partners Fundamental Value Fund, Inc., SF Capital Partners Ltd., and the Heartland Group, Inc., solely on behalf of the Heartland Value Fund (collectively, the "Former Noteholders"), through their undersigned counsel, hereby move, pursuant to Rule 59 of the Federal Rules of Civil Procedure (the "Federal Rules"), as made applicable to this proceeding by Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), or in the alternative, Rule 60 of the Federal Rules, as made applicable by Bankruptcy Rule 9024, for reconsideration of this Court's Order, dated January 27, 2010 (Docket No. 42; the "Order"), to the extent it denied the Former Noteholders' Motion to Dismiss (the "Motion to Dismiss") Counts VI and VII of the Complaint[1] and of the accompanying Opinion, also dated January 27, 2010 (Docket No. 41; the "Opinion").

## PRELIMINARY STATEMENT

For four independent reasons, the Former Noteholders respectfully submit that the Opinion, carried to its logical conclusion, requires dismissal of Counts VI and VII to correct clear errors of law and to prevent manifest injustice.

First, the Opinion acknowledges (and the Trustee never cited **any** cases to dispute) that, as a matter of law, a payment made to satisfy an antecedent debt cannot give rise to a claim for a fraudulent transfer. Yet the Opinion does not reach the ultimate legal question of whether the Exchange Agreement Payment was made to satisfy an antecedent debt, ruling that doing so would be inappropriate at this stage of the litigation. Nonetheless, the Complaint itself alleges that the Exchange Agreement Payment was made to satisfy the Notes. Further, the

---

[1] Each capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Opinion.

- 1 -

Trustee's Memorandum of Law filed in opposition to the Motion to Dismiss expressly confirms that fact. Consequently, there is no question of fact regarding whether the Exchange Agreement Payment was made to satisfy an antecedent debt. Under those circumstances, a ruling on the purely legal question of whether the allegations of the Complaint, if proved, state an actionable fraudulent transfer claim is appropriate and requires dismissal of Counts VI and VII.

Second, the Opinion acknowledges (and the Trustee never provided **any** case law to dispute) the well-established principle that a time-barred preference claim cannot be pleaded as a fraudulent transfer claim. Yet, while acknowledging the Debtor made the Exchange Agreement Payment on antecedent debt outside the preference period, the Opinion does not reach the ultimate question of whether the claims against the Former Noteholders constitute time-barred preference claims. Again, such a ruling is appropriate now and would require dismissal of the entire remaining Complaint.

Third, the Opinion did not consider that the same exhibits to the Complaint that are inconsistent with the allegations supporting the Trustee's claims against Aventis also are inconsistent with the Trustee's conclusory allegation that the Debtor did not receive "reasonably equivalent value" through the Exchange Agreement Payment. Indeed, the very same balance sheet the Trustee exclusively relies upon to support his insolvency allegation demonstrates the Debtor received reasonably equivalent value. Hence, the Trustee's allegation there was no reasonably equivalent value is pure speculation that is not permitted under the Federal Rules.

Fourth, the Opinion dismisses the Trustee's fraudulent transfer claims against Aventis, whose antecedent debt the Debtor paid <u>in full</u> while the Debtor allegedly was insolvent, but preserves the Trustee's fraudulent transfer claims against the Former Noteholders, who were

paid 20¢ or less of their antecedent debt while the Debtor allegedly was insolvent. Such inequity warrants dismissal of the Trustee's remaining claims to prevent manifest injustice.

For each of these reasons, the Former Noteholders respectfully request that the Court reconsider its rulings and dismiss Counts VI and VII of the Complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

The Trustee filed the Complaint on May 29, 2008 (Docket No. 5). On July 30, 2008, the Former Noteholders filed the Motion to Dismiss the Complaint (Docket No. 11). On September 15, 2008, the Trustee filed his Memorandum of Law (Docket No. 21, the "Trustee's Memo") in opposition. No oral argument was held on the Motion to Dismiss. The Order and Opinion granted the Motion to Dismiss respecting Count V of the Complaint, but denied the Motion to Dismiss respecting Counts VI and VII of the Complaint. The Order and Opinion also granted Aventis's motion to dismiss all claims against it based on the Debtor's payment of $3 million to Aventis in full satisfaction of a note while the Debtor allegedly was insolvent.

Solely for purposes of this motion, the Former Noteholders incorporate by reference the facts as described in the Opinion.

## ARGUMENT

### I. The Bankruptcy Rules Provide For Reconsideration Of The Opinion.

Bankruptcy Rule 9023 provides that Federal Rule 59 applies in cases under the Bankruptcy Code, with certain exceptions not applicable here. FED. R. BANKR. P. 9023 ("Rule 59 F.R.Civ.P. applies in cases under the Code, except as provided in Rule 3008."). Motions for reconsideration are the "functional equivalent" of motions to alter or amend a judgment under Federal Rule 59(e). *Tinney v. Genesco Communications, Inc.*, 502 F. Supp. 2d 409, 414 (D. Del. 2007) (*quoting Jones v. Pittsburg Nat'l Corp.*, 899 F.2d 1350, 1352 (3d Cir. 1990)). A decision to grant or deny a motion to amend or alter a judgment is within the Bankruptcy Court's

discretion. *In re Baker*, 206 B.R. 510 (Bankr. N.D. Ill. 1997); *In re Crozier Bros., Inc.*, 60 B.R. 683 (Bankr. S.D.N.Y. 1986). It is well-settled that a court may reconsider its ruling if the movant can demonstrate one of the following: (1) a change in the controlling law; (2) the availability of new evidence; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. *See Tinney*, 502 F. Supp. 2d at 415 (*citing Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F. 3d 669, 677 (3d Cir. 1999)); *see also The MAS Litigation Trust v. Plastech LDM (In re Meridian Automotive Systems-Composite Operations, Inc.)*, Adv. Proc. No. 07-51195, Mem. Op. at *1, Gross, J., 2008 WL 141160 (Bankr. D. Del. Jan. 11, 2008) (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 908 (3d Cir. 1985)). Here, it is respectfully submitted that there is a need to correct clear errors of law and to prevent manifest injustice.

Alternatively, the relief requested by this motion may be granted under Federal Rule 60 (as made applicable here under Bankruptcy Rule 9024).

## II. Four Independent Bases Warrant Reconsideration And Modification Of The Order And Opinion.

### A. As A Matter Of Law, Payments To Satisfy Antecedent Debt, Such As The Exchange Payment Here, Cannot Support A Fraudulent Transfer Claim.

Citing a long string of cases, the Opinion notes, "Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent." (Opinion p. 26). Nevertheless, in addressing the Former Noteholders' argument that the Exchange Agreement Payment was made in satisfaction of the Debtor's antecedent debt reflected by the Notes, the Opinion states:

> The Court finds that it is inappropriate, at this time, to consider whether the Exchange Agreement Payment was, in fact, satisfaction of antecedent debt. This Court may only consider whether the Complaint is facially plausible, and cannot, at this time, consider possible defenses to the allegations in the Complaint.

- 4 -

(Opinion pp. 26-27). Still, to find the Complaint is "facially plausible" requires a finding the Complaint states a valid cause of action.

Dismissal of a complaint is appropriate where the allegations in a complaint, accepted as true, do not state a cause of action. *Eaton v. Danberg*, 545 F. Supp. 2d 396, 398 (D. Del. 2008) (citations omitted). Thus, a complaint purporting to state a fraudulent transfer claim, but alleging the payment in dispute was made to satisfy an antecedent debt is subject to dismissal. For that reason, courts dispose of fraudulent transfer claims <u>on motions to dismiss</u> when those claims arise from payments made to satisfy antecedent debt. *See, e.g., In re Propex Inc., et al.*, Bkrtcy. No. 08-10249, Adv. No. 08-1136, 2009 WL 562595, at *2 (Bkrtcy. E.D. Tenn. March 5, 2009) (dismissing fraudulent transfer claim on motion to dismiss where debtor "received reasonably equivalent value" for $20 million payment **as a matter of law** because the payment reduced the principal balance of the indebtedness dollar-for-dollar) (citations omitted); *In re SHC, Inc., et al.*, 329 B.R. 438, 445-46 (Bkrtcy. D. Del. 2005) (same); *In re Atlanta Shipping Corp., Inc.*, 818 F.2d 240, 249 (2d Cir. 1987) (affirming same); *In re B.Z. Corp.*, 34 B.R. 546, 548 (Bkrtcy. E.D.Pa. 1983) (same); *cf. In re APF Co.*, 308 B.R. 183, 187 (Bkrtcy. D. Del. 2004) (finding dismissal of constructive fraud claim on motion to dismiss was justified because payments made on promissory note were made to satisfy antecedent debt, but denying motion because claim also pleaded actual fraud).

Here, the Complaint unambiguously alleges the Exchange Agreement Payment was made to retire the Debtor's debt reflected by the Notes:

> After continued pressure from the Noteholders, an Exchange Agreement ("Exchange Agreement") was reached with the Noteholders *in which the Noteholders agreed to surrender the Notes for a total payment of $3 million, and the issuance of 10,000 shares of preferred stock and 2 million shares of common stock.*

- 5 -

(Complaint ¶ 31 (emphasis added)). Correspondingly, in the Trustee's Memo, the Trustee repeatedly admits the Exchange Agreement Payment was in satisfaction of antecedent debt. For example, the Trustee states the Debtor's "payment of $3 million <u>served to satisfy a debt</u> . . . " to the Former Noteholders. (Trustee's Memo p. 11 (emphasis added)). Later, the Trustee again refers to the $3 million paid to the Former Noteholders as "satisfaction of a debt" and "satisfaction of debt." (*Id.* p. 12).

As the Complaint itself alleges and the Trustee concedes the Exchange Agreement Payment was made to satisfy an antecedent debt (i.e., the Notes), that determination does not require assertion of an affirmative defense. Instead, the Former Noteholders carry no evidentiary burden to establish that fact and that fact is not in dispute. Consequently, even if the Trustee proved every allegation in the Complaint and the Former Noteholders offered no evidence in support of any defense, the Trustee's fraudulent conveyance claims would fail as a matter of law because the Exchange Agreement Payment was made to satisfy an antecedent debt.

Thus, it is appropriate and necessary to decide at this stage whether the Complaint states a cognizable claim. As the Opinion did not reach that question, the Former Noteholders respectfully request that the Opinion and Order be reconsidered and the remaining claims against the Former Noteholders be dismissed.

**B.  As A Matter Of Law, The Trustee's Time-Barred Preference Claims Against The Former Noteholders Should Be Dismissed.**

Were the challenged payments made by the Debtor to the Former Noteholders within 90 days of the petition date, the payments might have been actionable as preference claims. But the payments were made earlier. (Opinion n. 79).

As the Opinion acknowledges, "Courts have held that there is a distinction between a preference and a fraudulent transfer and a time-barred preference action may not be

disguised as a fraudulent transfer action." (Opinion pp. 27-28 (lengthy string cite omitted)).

Thus, a debtor's payments of antecedent debt may be the subject of preference actions if such claims are timely, but as noted by the Opinion, courts recognize the "fundamental principle" that "a preference—a payment by an insolvent debtor satisfying debts to one creditor at the expense of others—is not a fraudulent conveyance." *In re Sharp Int'l Corp.*, 302 B.R. 760, 780 (E.D.N.Y. 2003). (Opinion at 28 n. 80).[2] Yet, in considering the Former Noteholders' argument that the Trustee's fraudulent transfer claims asserted against them should be dismissed on this basis, the Opinion states:

> Although the Trustee may have been able to plead the Exchange Agreement Payment as a preferential transfer had [it] been made within the 90 days prior to the petition date, it does not limit the Trustee's ability to assert other recovery theories such as fraudulent conveyance, if indicated. In the Complaint, the Trustee has asserted the elements of a fraudulent transfer and facts, taken as true, that establish a facially plausible cause of action. As such the Court will not dismiss the Count VI of the Complaint on the grounds that it is a disguised preferential transfer.

(Opinion at 28). Thus, the Opinion did not reach the ultimate question of whether the fraudulent transfer claims were merely time-barred preference claims subject to dismissal.

---

[2] The conclusion that a preferential transfer does not constitute a fraudulent conveyance also is mandated by practical considerations. Prior to bankruptcy a creditor could bring a fraudulent transfer action solely for such creditor's benefit:

> A single creditor can bring a fraudulent transfer action. "To allow such a creditor, thus acting in its own interest, to set aside a preferential transfer would simply amount to substituting him as the party preferred."

*In re Trace Int'l Holdings, Inc.*, 301 B.R. 801, 805-06 (Bankr. S.D.N.Y. 2009) (citations and footnote omitted), *vacated on other grounds*, No. 04 Civ. 1295 (KMW), 2009 WL 1810112 (S.D.N.Y. June 25, 2009). Hence, by substituting one creditor for another, a fraudulent transfer action based on a preference would accomplish nothing (as would be the ultimate result here if the Trustee succeeded with his fraudulent transfer complaint).

The illogic and inequity of enabling a trustee to use a fraudulent transfer claim as a substitute for a time-barred preference claim is demonstrated by the consequences of applying such an approach here. First, the Trustee's theory, that all payments made on antecedent debt while the Debtor was allegedly insolvent were for less than reasonably equivalent value because the debts were worth less than face value, leads to the nonsensical conclusion that every creditor who was paid on antecedent debt during the two years (under § 548) and six years (under § 544) preceding the Debtor's bankruptcy filing (assuming the Debtor then was insolvent) would have been subject to a fraudulent transfer action. That is because in each case, under the Trustee's theory, the creditor's antecedent debt was worth substantially less than face value due to the Debtor's financial difficulties. Second, as fraudulent transfer actions are now time-barred in the Debtor's case and the only such actions filed to the Former Noteholders' knowledge were against Aventis and the Former Noteholders, all of the Debtor's other creditors who also were paid on antecedent debt prior to the 90 day preference period have no potential fraudulent transfer liability. Third, most of such released creditors were paid in full on their claims while the Former Noteholders were paid 20¢ or less on the dollar on their claims. In fact, under the Opinion, Aventis, which was paid $3 million in full satisfaction of the Debtor's $3 million obligation that had been accelerated by the Debtor's default while allegedly insolvent, has no fraudulent transfer exposure while the Former Noteholders, who were paid $3 million on the Debtor's at least $15 million obligation to the Former Noteholders that had been accelerated by the Debtor's default, have fraudulent transfer exposure. This clearly inequitable result illustrates why a fraudulent transfer action based on payment of antecedent debt may not be used as a substitute for a time-barred preference action.[3]

---

[3] The inequity of the Trustee's approach is compounded by the fact that unlike in a preference action, the

- 8 -

The Opinion correctly finds, and the Trustee does not dispute, that the Exchange Agreement Payment was made more than 90 days before the Debtor's petition date. (Opinion pp. 6-7). Thus, at best, the Trustee has a time-barred preference claim. Under those circumstances, the Trustee's fraudulent transfer claims based on the Exchange Agreement Payment should be dismissed.

C. **The Opinion's Determination That The Trustee's Mere Allegation The Former Noteholders Did Not Provide The Debtor With Reasonably Equivalent Value Was Sufficient To Survive A Motion To Dismiss Is Inconsistent With Other Determinations In The Opinion.**

Even if a debtor's satisfaction of antecedent debt may be the basis for a fraudulent transfer claim and is not a time-barred preference action, the Complaint's reasonably equivalent value allegation is insufficient as a matter of law, and is contradicted by the Complaint's exhibits. The sole allegations in the Complaint regarding the Debtor's alleged failure to receive reasonably equivalent value under the Exchange Agreement are as follows:

> The attached Form 10-K filed by Aphton with the Securities Exchange Commission for the fiscal year ending December 31, 2005 shows that Aphton was insolvent as of the date of the Exchange Agreement. A true and correct copy of the Form 10-K for the year ending December 31, 2005, the terms of which are incorporated herein by reference, is attached hereto as Exhibit "I."
>
> Aphton lost 10,000 shares of preferred stock and 2 million shares of common stock; as well as the transfer of $3 million in cash pursuant to the Exchange Agreement Agreement [sic].
>
> The Debtor received less than a [sic] reasonably equivalent value in exchange for the transfer and/or obligation.

---

Former Noteholders (and any other creditors sued for a fraudulent transfer) do not even have the usual preference defenses available such as: (a) they received less than they would have received in a chapter 7 liquidation of the Debtor; (b) they provided subsequent new value; etc. See 11 U.S.C. § 547(b), (c). Correspondingly, unlike in a preference action in which the debtor's insolvency is required, the Trustee may pursue a fraudulent transfer action even if the Debtor were not insolvent, but merely undercapitalized or illiquid at the time of the transfer. See 11 U.S.C. § 548 (a)(1)(B)(ii). Such an inequitable result is not contemplated by the Bankruptcy Code.

(Complaint ¶¶ 63-65 (emphasis added)).

The Opinion found those allegations to be sufficient to withstand a motion to dismiss:

> <u>As the Complaint alleges that Aphton was insolvent</u> at the time of the Exchange Agreement Payment, <u>it must follow that the Notes</u> and the shares, both common and preferred, <u>were also worthless. As such, it is facially plausible that there was not reasonably equivalent value</u> in the Exchange Agreement Payment in which Aphton also provided $3 million in cash. <u>The value given by the Former Noteholders to the Debtors is in dispute and not appropriate for determination on a motion to dismiss.</u> "All that is needed at this stage is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent." These allegations have been made in Count VI of the Complaint.

(Opinion p. 27 (emphasis added) (quote cites to *In re DVI, Inc.* at \*27)).

Yet, the Opinion also found that to survive a motion to dismiss, the Trustee's reasonably equivalent value allegation must be "facially plausible" and "permit the court to infer more than the mere possibility of misconduct." (Opinion pp. 14-15 (citations omitted)). As a matter of law, therefore, merely alleging the legal conclusion that while insolvent, the "Debtor received less than a reasonably equivalent value," Complaint ¶ 65, is insufficient.[4] *See, e.g., In*

---

[4] *In re DVI, Inc.*, 2008 Bankr. Lexis 2338 (Bankr. D. Del.) does not reach a different result. *DVI* held "that *Twombly* requires that a Complaint contain more than just conclusory reiterations of the statutory basis for a claim. The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim." *Id.* \*12-13. Thus, while the *DVI* Court ultimately found that the fraudulent transfer claim was stated by an allegation of unreasonably equivalent value when the debtor was insolvent, *id.* \*27, that was in the context of a "54-page Complaint" in which the plaintiff alleged there was "no consideration" whatsoever. *Id.* \*2, 23. In contrast, here we have a bare bones Complaint and the Trustee must concede meaningful consideration was given by the Former Noteholders because: (a) the Debtor's satisfaction of antecedent debt is "value" under section 548(d)(2)(A); (b) the Former Noteholders providing the Debtor with breathing room to attempt an out of court workout is value; and (c) at least a significant portion of the $3 million the Debtor used to satisfy the Notes must be attributed to the value of the Notes because the Notes represented the bulk of the Debtor's liabilities at that time. *See* 2005 Form 10-K pg. 33. Unlike in *DVI*, therefore, here the issue is not whether the Former Noteholders provided any value, but whether they provided reasonably equivalent value.

*re Image Masters, Inc.*, 2009 WL 4894462 *6, n. 18 (Bankr. E.D. Pa.) (holding trustee's conclusory allegations of reasonably equivalent value were insufficient to plead lack of reasonably equivalent value; "I need not accept such allegations because 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.'") (*quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)); *In re Caremerica*, 409 B.R. 737, 756 (Bankr. E.D.N.C. 2009) ("Under *Iqbal*, it follows that claims to avoid constructively fraudulent transfers must assert factual allegations which show the relief is plausible." Thus, the Court granted a motion to dismiss constructive fraudulent transfer claim because, inter alia, the Complaint did not include "information as to why the value of such consideration was less than the amount transferred.")[5].

Even, however, if the Trustee's conclusory allegation that the Debtor did not receive reasonably equivalent value could be sufficient in a vacuum, the Opinion further states that if "the allegations of the Complaint are contradicted by documents incorporated therein," then "the document controls and the Court need not accept as true the allegations of the Complaint." (Opinion p. 24 (citations omitted)). That is exactly the case here. The Trustee's less than reasonably equivalent value allegation in the Complaint purports to be supported by, yet is directly contradicted by the Debtor's December 31, 2005 Form 10-K that is "incorporated" into the Complaint, and which contains the only financial facts alleged in the Complaint. (Complaint ¶ 25). That is because the Form 10-K shows the Notes had a much higher value than

---

[5] *See also In re Global Link Telecom Corp.*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (granting Rule 9(b) motion to dismiss because complaint "simply alleges the statutory elements of a constructive fraud action under section 548(a)(1)(b)" and "presents no information on . . . the value of what was received in exchange."); *In re Oakwood Homes Corp.*, 325 B.R. 696, 699 (Bankr. D. Del. 2005) (granting Rule 9(b) motion to dismiss constructive fraudulent transfer claim because plaintiff "essentially recited only the statutory language of § 548(a) of the Code") (footnote omitted).

the amount the Debtor paid under the Exchange Agreement, while a much lower value would be required for the Trustee to prevail here.

As to the amount the Debtor paid, at most, the Former Noteholders received approximately 18¢ on the dollar, while the Debtor was able to remove a minimum of $15 million plus accrued and unpaid interest from its liabilities. That conclusion is based on: (a) the Former Noteholders having received $3 million in cash (and the Aphton stock the Trustee states was "worthless," *see, e.g.*, Complaint ¶ 31)[6]; and (b) the Noteholders' minimum claim as of November 23, 2005 having totaled $16.5 million based on the following components:

- The Trustee alleges the Notes had an "aggregate face value" of "$15 million."[7] Complaint ¶ 27.

- The Trustee admits that "[u]pon the occurrence of an event of default, the [Former] Noteholders were entitled to redeem any portion of the Notes for cash equal to 110% if [sic] the Notes being redeemed." Complaint ¶ 29. Further, the Trustee admits such an event of default had occurred. *See* Trustee's Memo p. 11 ("there was clearly a default"); p. 13 (the Former Noteholders "had reason to question the solvency of Aphton due to the event of default"). Thus, at least an additional 10% of principal, i.e., $1.5 million, was due on the Notes.

As to the value of the Notes, the Trustee's support for the conclusion the Notes were worth substantially less than 18¢ on the dollar (beyond asserting the legal conclusion that the Debtor did not receive reasonably equivalent value in exchange) was that the Debtor then

---

[6] Regarding the value of the Aphton stock, the Trustee cannot have it both ways. Either the Aphton stock transferred to the Former Noteholders in November 2005 was "worthless" and "valueless" as stated in the Trustee's Memo (p. 12), and, therefore, Aphton transferred no value through the stock (and can recover no value for an alleged fraudulent transfer of the stock), or the stock had meaningful value, in which case the Notes, which were senior to the stock, must have been worth close to par (and certainly more than Aphton paid).

[7] As the Opinion recites, the Former Noteholders assert the face amount of the Notes was $20 million. (Opinion at n. 75). Additionally, there is no dispute the Notes accrued interest at no less than 6% per annum payable quarterly in arrears. *See* Form 10-K p. 32. Thus, on November 23, 2005, there would have been at least $202,191.78 of accrued and unpaid interest on the Notes based on a 6% interest rate applied to $15 million of principal for 84 days (September 1 to November 23).

was insolvent based on the 2005 Form 10-K. (Complaint ¶¶ 63-65). Based on that alleged insolvency, the Opinion found the Notes must have been "worthless":

> As the Complaint alleges that Aphton was insolvent at the time of the Exchange Payment Agreement, it must follow that the Notes and the shares, both common and preferred, were also worthless.

(Opinion p. 27). Yet, while the Debtor's insolvency might signify the Notes were worth less than par, in no sense could insolvency alone lead to the "reasonable inference" the Notes were worth substantially less than the approximately 18¢ on the dollar allegedly paid by the Debtor to retire the Notes under the Exchange Agreement. (Opinion p. 14). In effect, a debtor's "insolvency" merely signifies its liabilities exceed its assets, not the extent of such excess.

Indeed, the sole facts provided in the Complaint on such value, which are in the 2005 Form 10-K attached to and incorporated in the Complaint and <u>which are the sole basis for the Trustee's insolvency allegation, directly contradict</u> the conclusion the Debtor received substantially less than 18¢ on the dollar in value. Specifically, the Form 10-K repeatedly states that as of December 31, 2005, the Debtor's consolidated and audited "Total assets" were "$6,776,000" and "Total liabilities" were "$11,641,000." (Form 10-K p. 33, Balance Sheet on Exhibit F-5). If the $3 million paid to the Former Noteholders is added to the "Total assets" and the $16.5 million minimum amount due on the Notes is added to the "Total liabilities" (so as to reflect the Debtor's balance sheet just prior to the Exchange Agreement Payment), then as of November 23, 2005, the Debtor's "Total assets" would have been $9,776,000 and the "Total liabilities" would have been $18,141,000. As the Form 10-K reflects <u>no</u> secured debt, that assets to liabilities ratio signifies a value for unsecured liabilities such as the Notes of approximately

- 13 -

54¢ on the dollar when the Exchange Agreement closed on November 23, 2005 (and approximately 58¢ on the dollar on December 31, 2005).[8]

Hence, by incorporating the Debtor's Form 10-K in the Complaint as the sole source of information on value (and providing no basis to question the Form 10-K's numbers), the Trustee acknowledged the Notes were worth approximately 54¢ on the dollar in November 2005. Accordingly, the Complaint was mutually inconsistent with the Opinion's finding that the Notes were "worthless" or any conceivable conclusion that in November 2005, the Notes had a value substantially less than the 18¢ on the dollar paid by the Debtor. Thus, as the Opinion held documents incorporated into the Complaint may not be inconsistent with allegations in the Complaint, the Opinion requires the conclusion the Trustee did not make (and could not have made) a credible allegation that the Debtor's payment of $3 million (plus "worthless" stock) in exchange for the Notes substantially exceeded the Notes' fair market value on November 23, 2005. Indeed, as the amounts in the 10-K were the sole source of financial information on the Debtor, and the Trustee relied on and provided no basis to challenge the Form 10-K financial information, the Trustee's assertion the Former Noteholders did not provide reasonably equivalent value is at best, pure speculation. At a minimum, there was no basis for the Court to draw "reasonable inferences" that the Debtor did not receive reasonably equivalent value from the Trustee's allegations. (Opinion p. 24). Consequently, as a matter of law <u>and based on other determinations in the</u>

---

[8] In fact, other statements in the Form 10-K demonstrate the cents on the dollar value of the Notes, as liabilities of the Debtor, were <u>higher</u> than 54¢ cents on the dollar on November 23, 2005. First, the Form 10-K reported on a consolidated basis, with the Debtor's "wholly-owned subsidiary," Igeneon (an Austrian corporation the Debtor had acquired on March 24, 2005) owing $7.5 million of the Debtor's $11.6 million of consolidated liabilities. *See* Form 10-K pp. 25, 34, 41. Thus, the Debtor's asset to liabilities ratio was higher if its subsidiary's debt is excluded. Second, the Debtor lost over $65 million during 2005. *See id.* p. 38. As some of that loss presumably occurred <u>after</u> November 23, 2005, it is logical to assume the Debtor's asset to liability ratio was higher on November 23 because the Debtor's liabilities were smaller than on December 31. Moreover, during the 4th quarter of 2005, the price for the Debtor's common stock ranged from 29¢ to 64¢ a share. *See id.* p. 31. That signifies that at the end of 2005, the Debtor's equity had some value and, therefore, the Debtor's debt, including the Notes, had substantial value.

- 14 -

Opinion, the Trustee failed to make the required "facially plausible" allegation that the Debtor did not receive reasonably equivalent value under the Exchange Agreement.

> **D. The Trustee's Claims Against The Former Noteholders Should Be Dismissed In Order To Be Consistent With The Opinion's Ruling Dismissing The Trustee's Claims Against Aventis.**

The Opinion notes that, according to the Complaint, the Debtor and Aventis entered into a Debenture Purchase Agreement in which the Debtor agreed to sell and Aventis agreed to purchase the Debenture, which was in the principal amount of $3 million and due December 19, 2007. (Opinion at 6). The Complaint further alleges Aventis demanded payment on the Debenture in April, 2005, and the Debtor deemed the Debenture satisfied in full with a payment of $3 million. (Complaint ¶¶ 24-25). Thus, according to the Complaint, Aventis's antecedent debt was paid in full in August, 2005, while the Debtor was insolvent.

The Complaint also alleges that, in November 2005, the Former Noteholders received the Exchange Agreement Payment of $3 million from the Debtor to retire what was alleged to be $15 million in obligations under the Notes[9]. Thus, according to the Complaint, the Former Noteholders received approximately 20¢ on the dollar in exchange for surrendering the Notes while the Debtor was insolvent.

The Opinion's dismissal of the Trustee's claims against Aventis, which was paid in full when the Debtor allegedly was insolvent, while maintaining the Trustee's claims against the Former Noteholders, which were paid less than 20 cents on the dollar when the Debtor allegedly was insolvent, makes the Opinion internally inconsistent.[10] Accordingly, the Trustee's

---

[9] The Debtor's obligation to the Former Noteholders actually was much higher and, therefore, the Former Noteholders' recovery was at best 18¢ on the dollar. *See* Argument II.C. above.

[10] The fact that the specific reason in the Opinion for dismissing the Trustee's claims against Aventis did not apply to the Trustee's claims against the Former Noteholders does not change that conclusion because the

remaining claims against the Former Noteholders should be dismissed to prevent manifest injustice.

## CONCLUSION

For the foregoing reasons, the Former Noteholders respectfully request that the Court reconsider the Order and Opinion and enter an order dismissing Counts VI and VII of the Complaint.

Dated: February 8, 2010

PEPPER HAMILTON LLP

*/s/ David B. Stratton*

David B. Stratton (Bar No. 960)
Hercules Plaza
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6566 (tel.)
(302) 421-8390 (fax)

-and-

WILLKIE FARR & GALLAGHER LLP
Alan J. Lipkin
Paul W. Horan
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000 (tel.)

Co-attorneys for Defendants Legg Mason Partners Fundamental Value Fund, a series of Legg Mason Partners Equity Trust and successor to Legg Mason Partners Fundamental Value Fund, Inc., SF Capital Partners Ltd., and the Heartland Group, Inc., solely on behalf of the Heartland Value Fund

---

same fraudulent transfer legal theory is applicable to the Debtor's payments to both Aventis and the Former Noteholders.